J-A06040-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MAREKUS EDWARD BENSON | : | |
| | : | |
| Appellant | : | No. 548 WDA 2023 |

Appeal from the Judgment of Sentence Entered January 18, 2023
In the Court of Common Pleas of Somerset County Criminal Division at
No(s): CP-56-CR-0000470-2021

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and BECK, J.

MEMORANDUM BY BECK, J.: **FILED: May 9, 2024**

Marekus Edward Benson ("Benson") appeals from the judgment of sentence imposed following his convictions of two counts each of first-degree murder, aggravated assault, kidnapping, and unlawful restraint, and eight counts of conspiracy.[1] Benson raises eight claims of error. After review, we affirm.

Benson, Samson Ezekiel Washington ("Washington"), and Devon Wyrick ("Wyrick")[2] were members of the East Main Money Gang from Columbus, Ohio, who came to Johnstown, Pennsylvania to sell drugs. In March 2017, a stash house in Johnstown used by the East Main Money Gang was burglarized

_____

[1] 18 Pa.C.S. §§ 2502(a), 2702(a)(1), 2901(a)(3), 2902(a)(1), 903(a).

[2] Washington and Wyrick are half-brothers.

and the burglars stole drugs, money, and a firearm. Benson, Washington, Wyrick, Jasmine Browning ("Browning"),[3] and Jasmine Hinton ("Hinton")[4] proceeded to Washington's home to discuss the burglary. Gang members contacted several drug users to identify the burglars. On March 26, 2017, Washington and Benson went to a well-known drug house, where they asked Amanda Ehrhart ("Ehrhart") and Tracey Kralik ("Kralik") about the missing drugs and money. While at the house, Benson flashed his gun. Benson and Washington, however, failed to learn any new information about the missing drugs.

The following day, Joshua Bergmann ("Bergmann") informed Washington that James Smith ("Smith") and Damian Staniszewski ("Staniszewski") suddenly possessed a large quantity of drugs. At Washington's request, Bergmann led Benson, Washington, Wyrick, and Deandre Callender ("Callender") to Staniszewski's residence in Portage, Pennsylvania, but no one was there. Later that day, however, Smith and Staniszewski contacted Hinton to purchase drugs from Washington. The parties agreed to meet at the Galleria Mall.

At the mall, Smith and Staniszewski got in the back seat of the vehicle that Wyrick was driving. Browning followed in another vehicle. Wyrick then

---

[3] Browning and Washington have a child together.

[4] Hinton and Benson were in a relationship.

picked up Washington, who, upon entering the vehicle, pointed a gun at Smith and Staniszewski and stated that they would not get away with stealing the drugs, money, and firearm. Wyrick drove to the stash house. At this point, Browning observed Wyrick and Washington take Smith and Staniszewski into the house and left the scene.

Smith and Staniszewski were taken down into the basement where Wyrick punched Staniszewski in the mouth and Washington poured bleach in Staniszewski's mouth. Washington called Benson, stating that they got the people who stole the drugs and told Benson to come to the home. Upon arriving, Benson asked the victims the location of the drugs. The victims indicated a different person stole the drugs; thereafter, Benson struck one of the victims in the face with the butt of his gun. Washington then invited Bergmann to the stash house. Bergmann professed his innocence, and, upon seeing the victims, indicated the victims were in the situation because of the stolen drugs. Washington gave Bergmann drugs as he left the scene.

Subsequently, Benson retrieved Staniszewski's truck from the mall to search it for the missing money and drugs. After Benson found only a small portion of the stolen property in the truck, he indicated to Wyrick that he would kill Smith and Staniszewski. Later, Benson and Washington put the victims into Staniszewski's truck and drove them to a wooded area off Ligonier Pike in Somerset County. Wyrick followed in a separate vehicle. As soon as Staniszewski's truck stopped, Smith attempted to run away from the scene.

Benson shot him in the back. Benson then attempted to shoot Staniszewski, but his gun malfunctioned. Consequently, Washington left the scene to retrieve another weapon. Benson and Wyrick waited at the scene with the two victims. Upon returning, Washington shot both victims in the head two times. Benson, Washington, and Wyrick ran out of the woods. While running, Benson dropped his laser aiming device.

Benson and Washington then drove away in Staniszewski's truck while Wyrick followed them. Benson and Washington eventually pulled over along Somerset Pike, wiped their fingerprints from Staniszewski's truck, abandoned the truck, and left the scene in Wyrick's vehicle. Afterwards, they drove to a different wooded area, disassembled their firearms, and left the components in the woods. Subsequently, Benson, Washington, and Wyrick returned to Johnstown. They went to Browning's residence and argued about Benson dropping the laser aiming device from his firearm as they fled the woods and Washington inviting Bergmann to come into his basement while the victims were there. Washington told Browning that they had beaten up the victims in the basement and then shot them in the woods.

On March 28, 2017, the police found Staniszewski's truck near a bar called "Jim & Jimmies." The remains of Smith and Staniszewski were discovered on September 29, 2017. The police classified the cause of death for both victims as homicide. During the subsequent investigation, the FBI mapped the locations of cell phone numbers associated with Callender,

Wyrick, Smith, Staniszewski, Bergmann, and a phone that was designated as a "shared phone." Notably, the victims called the "shared phone" to set up the drug deal that was to take place at the Galleria Mall and the victims' cell phones pinged off cell towers near the stash house on March 27, 2017. The FBI also determined that various calls and texts were made to a phone belonging to Benson and two phones belonging to Washington from some of the mapped phones.

The police arrested Benson and the Commonwealth charged him in the initial criminal complaint with two counts each of criminal conspiracy to commit criminal homicide, aggravated assault, kidnapping, and unlawful restraint. The trial court held a joint preliminary hearing with Benson, Callender, and Hinton on June 9, 2021.[5] Browning testified at the preliminary hearing. The conspiracy charges against Benson were held over for trial. On June 28, 2021, the Commonwealth filed a criminal information, charging Benson with the eight counts of conspiracy, and two counts each of criminal homicide, aggravated assault, kidnapping, and unlawful restraint. Later, Benson, Callender, and Hinton were joined as codefendants with Washington and Wyrick.

---

[5] Washington and Wyrick were previously arrested and had a joint preliminary hearing in February 2019.

Benson filed several pretrial motions, including, in relevant part, a motion to sever the cases and a habeas corpus motion, arguing that the Commonwealth failed to prove a prima facie case of conspiracy. On June 30, 2022, the trial court held a hearing on the various motions of Benson, Washington, Callender, Hinton, and Wyrick. At the hearing, Browning again testified in relation to the cases against Wyrick and Washington. Nevertheless, the trial court allowed counsel for Benson, Callender, and Hinton to lodge objections to the testimony. The trial court also offered them the opportunity to cross-examine Browning, but Benson declined because he did not want her testimony to be used against him when deciding his habeas motion. Ultimately, the trial court denied the motions to sever and for habeas corpus relief. The trial court allowed the introduction of evidence that Benson was a drug dealer, a single thirty-three second clip from one of the rap videos propounded by the Commonwealth, and the threats against Ehrhart and Kralik.

Separately, the Commonwealth filed notice of its intent to introduce evidence that Benson was a drug dealer in the Johnstown community at the time of the murders; that Benson and Washington threatened two women (Ehrhart and Kralik) they believed were connected to the burglary; and multiple music videos featuring Benson and displays of drug dealing, firearms, and gang activity. The Commonwealth also filed a motion in limine, requesting that the defense be precluded from introducing statements made by Landon

Reighard ("Reighard"), who was deceased. Benson filed a motion in limine, seeking to exclude his prior criminal history and evidence that he and Washington threatened Ehrhart and Kralik with firearms when searching for the stolen drugs.

The trial court ultimately granted the Commonwealth's motion to exclude Reighard's statements, aside from three specific statements made by Reighard that were against his interest: (1) he was involved with the victims in the robbery of the Benson, Washington, and Wyrick, (2) he used illicit drugs, and (3) he was helping the victims to sell drugs. The trial court allowed the Commonwealth to introduce evidence that Benson was a drug dealer and further allowed the admission of thirty-three seconds of only one video that showed gang-related imagery. The trial court also granted Benson's motion as to his prior criminal history, but denied the motion as to the threats to the two people.

Originally, the trial court scheduled trial for October 12, 2022, but prior to trial, Wyrick pled guilty to two counts of third-degree murder and agreed to testify on the Commonwealth's behalf.[6] The jury trial held on the charges against Benson, Washington, and Callender occurred between October 17 and October 21, 2022. Relevantly, Browning did not testify at trial, despite being subpoenaed and called as a witness by the Commonwealth. Although she

_____

[6] Hinton's case was also severed from this case after the trial court dismissed conspiracy charges against her.

initially appeared at the courthouse, she ran out after refusing to take the stand. The trial court issued a material witness warrant and indicated that if she could not be located, it would declare her to be unavailable and allow the transcripts of her preliminary and habeas hearings to be read into the record. Benson objected to the use of Browning's prior testimony at trial. The Commonwealth was unable to locate Browning, however, and the trial court allowed Browning's prior testimony to be read to the jury.

At the conclusion of trial, the jury found both Benson and Washington guilty of all charges and acquitted Callender. On January 4, 2023, the trial court sentenced Benson to an aggregate term of life in prison without the possibility of parole. The trial court also ordered restitution to the victims' families for funeral expenses to be paid jointly and severally by the codefendants. Specifically, the trial court ordered Washington and Benson to pay $1,644.96 to Staniszewski's family and $2,800 to Smith's family. The Commonwealth filed a timely post-sentencing motion, seeking to amend the restitution for Smith's funeral to $2,770 and payment be made to the funeral home. On January 18, 2023, the trial court granted the Commonwealth's motion.[7] Benson filed a timely post-sentence motion, which the trial court denied, following which Benson timely appealed.

---

[7] **See Commonwealth v. Garzone**, 993 A.2d 1245, 1254 (Pa. Super. 2010) (noting that where the trial court grants the Commonwealth's post-sentence
*(Footnote Continued Next Page)*

Benson raised the following questions for our review:

1. Whether the Trial Court abused its discretion in failing to sever the cases of the co-defendants[?]

2. Whether the Trial Court erred in allowing the Commonwealth to use at Trial both Jasmine Browning's Preliminary Hearing testimony and her testimony from the Habeas Corpus Hearing against [Benson?]

3. Whether the Trial Court erred in permitting the Commonwealth to present a Rap Video as evidence during the trial[?]

4. Whether the Court erred in permitting the Commonwealth to proceed with trial on the homicide, aggravated assault, and unlawful restraint charges where the only charges bound to court against [Benson] were Conspiracy to commit these offenses, simply based upon the Commonwealth filing an amended information that included the additional charges[?]

5. Whether the Trial Court erred by admitting as a demonstrative exhibit which included reference to a phone number that had not been properly authenticated as being a phone number linked to [Benson?]

6. Whether the Trial Court erred by admitting evidence that [Benson] was a drug dealer in the community[?]

7. Whether the Trial Court erred in precluding a recorded statement of [] Reighard made to police and by precluding the defense from engaging in a line of questioning regarding Reighard's statements made in this recording[?]

8. Whether the Trial Court erred in reaching a verdict that [Benson] committed two counts of homicide and reaching an overall verdict without sufficient evidence[?]

Benson's Brief at 2-4.

---

motion, the appeal lies from the amended judgment of sentence).  We have changed the caption to reflect the proper date of sentencing.

## 1. **Severance**

In his first claim, Benson makes several disjointed arguments concerning the trial court's severance decisions. *Id.* at 4-8. He first contends generally that the trial court abused its discretion in failing to sever his case from his codefendants' case, which he states prejudiced him.[8] *Id.* at 4. As somehow supporting this claim, he asserts that codefendant Wyrick was required to testify against Benson to get a plea deal, and that Wyrick admitted on the record that his testimony "was not his version of the truth." *Id.* at 7. *Id.* Benson baldly alleges that severance was required because Hinton's case was improperly severed without notice or opportunity to be heard by him or any of his codefendants. *Id.* at 7-8. Benson argues that the severance motion as to Hinton moved forward at the pretrial motion hearing without notice or the opportunity for all the codefendants to be present; therefore, the remaining cases should have been severed because "prejudice is presumed due to the absence of all codefendants at a critical stage of the joined proceedings." *Id.* at 8.

"Whether to join or sever offenses for trial is within the trial court's discretion and will not be reversed on appeal absent a manifest abuse thereof,

---

[8] Benson refers generally to "co-defendants" throughout his argument and does not name them by name. Based upon his citations to the record and the arguments made, however, we are able deduce that the specific claims he makes concern Wyrick and Hinton.

or prejudice and clear injustice to the defendant." ***Commonwealth v. Knoble***, 188 A.3d 1199, 1205 (Pa. Super. 2018) (citation omitted).

The authority to try codefendants together in a single trial is provided by Pennsylvania Rule of Criminal Procedure 582(A), which provides:

> (2)     Offenses charged in separate indictments or informations may be tried together if:
>
>>    (a)     the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or
>>
>>    (b)     the offenses charged are based on the same act or transaction.
>
> (2) Defendants charged in separate indictments or informations may be tried together if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.

Pa.R.Crim.P. 582(A).  "The court may order separate trials of offenses or defendants, or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together." Pa.R.Crim.P. 583.  However, "[u]nder Rule 583, the prejudice the defendant suffers due to the joinder must be greater than the general prejudice any defendant suffers when the Commonwealth's evidence links him to a crime." ***Commonwealth v. Dozzo***, 991 A.2d 898, 902 (Pa. Super. 2010) (citation omitted).

Our Supreme Court has further explained:

Where … the crimes charged against each defendant arise out of the same facts and virtually all of the same evidence is applicable to both defendants, this Court, as well as the United States Supreme Court, have indicated a preference to encourage joint trials to conserve resources, promote judicial economy, and enhance fairness to the defendants:

It would impair both the efficiency and the fairness of the criminal justice system to require … that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability.

Given this preference, the burden is on defendants to show a real potential for prejudice rather than mere speculation.

*Commonwealth v. Rainey*, 928 A.2d 215, 231-32 (Pa. 2007) (citations and quotation marks omitted).

At the outset, we observe that Benson and Wyrick were not tried together, as Wyrick pled guilty and did not face trial. Benson does not explain how Wyrick's decision to plead guilty and testify against the remaining codefendants established that Benson's case should be severed. *See* Pa.R.A.P. 2119(a) (stating that argument section of brief must contain pertinent discussion and citation to authority). Moreover, Wyrick's statement that he did testify to "his version" of the truth at trial does not ipso facto establish that Benson's case should have been severed from his codefendants,

and Benson provides no argument in support of a contrary finding.[9] Therefore, Benson's claim in this regard is without merit.

Benson also has not established that Hinton's case was severed without the presence of Benson or the remaining codefendants or that any action concerning Hinton's case by the trial court required severance of the remaining codefendants' cases. Notably, the trial court states that Hinton's case was not severed on the date specified by Benson. Benson does not rebut the trial court observation that no "critical stage" of the proceeding occurred on the date identified by Benson and that it "did not make any decision that day that impacted or affected any of the remaining four co[]defendants; and in fact[,] at that time, I did not sever her case so the status quo was essentially maintained." N.T., 6/30/2022, at 204. In any event, Benson has not established, through citation to any authority, that the purported failure to have all codefendants attend a hearing on a motion to sever one codefendant's case, automatically necessitates severance of the remaining codefendants' cases. *See* Pa.R.A.P. 2119(a). Accordingly, Benson's claim regarding Hinton therefore does not merit relief.

Benson does not dispute that the consolidation of his case with his codefendants promoted judicial economy and enhanced fairness among the

---

[9] Viewed in context, the record reflects that Wyrick made this statement in response to a question on cross-examination wherein defense counsel suggested that Wyrick's testimony was not entirely truthful but was instead "his version" of the truth. N.T., 10/19/2022, at 750.

- 13 -

codefendants. *See Rainey*, 928 A.2d at 231. At trial, the prosecution presented numerous witnesses, and forensic and cell phone data evidence. Consolidating the three cases eliminated the inconvenience and burden for the prosecution to require these witnesses to give testimony at multiple prosecutions. *See id.* Furthermore, "joint trials are preferred where conspiracy is charged." *Commonwealth v. Housman*, 986 A.2d 822, 834 (Pa. 2009). In fact, Benson recognizes this proposition and raises no argument that requires a contrary finding.[10] *See* Benson's Brief at 6. Accordingly, Benson failed to show that the trial court abused its discretion in consolidating his trial with his codefendants.

## 2. **Browning's Testimony**

In his second claim, Benson contends that the trial court erred in permitting the Commonwealth to read into the trial record the testimony of Browning from the preliminary and pretrial hearings, as it was violative of the Confrontation Clause. Benson's Brief at 9, 18. Benson argues that Browning was not unavailable to testify at the trial, as the Commonwealth did not make a good faith effort to locate Browning or compel her appearance at trial. *Id.* at 9, 11-12. Benson highlights that Browning did not die, and the

---

[10] "Severance may be proper where a party can establish the co[]defendants' defenses are so antagonistic that a joint trial would result in prejudice." *Housman*, 986 A.2d at 834. Benson has not argued or established that severance would be proper because the codefendants' defenses were antagonistic to his defense.

- 14 -

Commonwealth provided no evidence that she could not be served with a subpoena to appear. *Id.* at 12. Benson claims that his counsel did not have a full and fair opportunity to cross-examine Browning at either the preliminary hearing or the pretrial hearing, noting that Browning's credibility was not at issue at the hearings. *Id.* at 9, 12-18. Benson also asserts that Browning's habeas corpus testimony at the hearing on the pretrial motions was offered against Washington and Wyrick, and Benson had no need to cross-examine her at this hearing. *Id.* at 14-15. Benson claims that had he questioned Browning at the pretrial hearing, it could have opened the door to incriminating evidence against him that the Commonwealth had not proffered. *Id.* at 15. Benson seeks a new trial. *Id.* at 18.

Pennsylvania Rule of Evidence 804(b)(1) "permits the admission of prior recorded testimony from a preliminary hearing as an exception to the hearsay rule when the witness is unavailable, the defendant had counsel, and the defendant had a full and fair opportunity for cross-examination at the preliminary hearing." *Commonwealth v. Leak*, 22 A.3d 1036, 1044 (Pa. Super. 2011) (citation omitted); *see also* Pa.R.E. 804(b)(1). A declarant is unavailable, in relevant part, when she "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure … the declarant's attendance, in the case of a hearsay exception under Rule 804(b)(1)[.]" Pa.R.E. 804(a)(5)(A). The Commonwealth must show that it made a good faith effort to try to produce

the live testimony of the witness. *Commonwealth v. Lebo*, 795 A.2d 987, 990 (Pa. Super. 2002); *see also Commonwealth v. Blair*, 331 A.2d 213, 215 (Pa. 1975) (stating that the rule "does not require that the Commonwealth establish that the witness has disappeared from the face of the earth; it demands that the Commonwealth make a good-faith effort to locate the witness and fail"). The decision of the trial court to determine what constitutes a good faith effort to locate a missing witness "will not be overturned absent an abuse of discretion." *Commonwealth v. Douglas*, 737 A.2d 1188, 1196 (Pa. 1999).

<u>Unavailability</u>

The record reflects that at trial, the Commonwealth called Browning to testify; however, she would not take the stand. N.T., 10/18/2022, at 279. The Commonwealth indicated that Browning's refusal to testify was a delay tactic and she did not want to testify. *Id.* at 286. The Commonwealth then called Browning again. *Id.* at 287. Browning exited the courtroom at this point and refused to testify. *Id.* at 287-88. The following day, the Commonwealth again stated it would call Browning as a witness but was unable to locate her. N.T., 10/19/2022, at 517. The Commonwealth requested the issuance of a material witness warrant, and that if Browning could not be located, the trial court declare her an unavailable witness and have her preliminary hearing transcript read into the record. *Id.* at 517-20. The Commonwealth noted that when Browning exited the courtroom the prior

day, she stated that "she was scared to death[,]" "did not wish to testify[,]" and "would not testify." *Id.* at 797. The Commonwealth indicated it attempted to locate Browning by going to her home, which she shared with her sister and mother, contacting her sister and mother, and calling Browning. *Id.* at 798. The Commonwealth also noted that Browning was under subpoena to testify. *Id.* Subsequently, the trial court found Browning to be unavailable, and counsel for Benson agreed with this finding. *Id.* at 799; *see also id.* at 768 (wherein Benson's counsel conceded that Browning was "an unavailable witness").

Benson's concession notwithstanding, the record supports the trial court's finding that the Commonwealth exerted reasonable efforts to locate Browning and that such efforts constituted a good faith effort to procure her attendance and testimony at trial. *See* Trial Court Opinion, 8/1/2023, at 18-20; *see also Douglas*, 737 A.2d at 1196 (concluding the trial court did not abuse its discretion in finding the Commonwealth made a good faith effort to locate the witness by searching his apartment, searching places he was known to frequent, and contacting his mother, sister, and girlfriend). Accordingly, Benson's argument related to the trial court's finding that Browning was unavailable fails.

<u>Confrontation</u>

Benson's claim that he did not have a full and fair opportunity to cross-examine Browning implicates his right to confrontation enumerated in both

the Pennsylvania and United States Constitutions and the evidentiary rules related to hearsay. **See Commonwealth v. Grush**, 295 A.3d 247, 251 (Pa. Super. 2023) ("Introducing statements of an unavailable witness presents issues relating to both the constitutional rights of confrontation as well as evidentiary rules governing introduction of hearsay."). Benson's constitutional right to confront the witnesses against him raises a question of law, and our standard of review is de novo and scope of review is plenary. **Commonwealth v. Mitchell**, 152 A.3d 355, 358 (Pa. Super. 2016).

In determining the admissibility of prior testimony, the critical issue is whether the defendant had a full and fair opportunity to cross-examine the witness. **Id.** "The Commonwealth may not be deprived of its ability to present inculpatory evidence at trial merely because the defendant, despite having the opportunity to do so, did not cross-examine the witness at the preliminary hearing as extensively as he might have done at trial." **Commonwealth v. Leaner**, 202 A.3d 749, 775 (Pa. Super. 2019) (citation omitted). If at the time of the preliminary hearing, however, the defendant did not have access to vital impeachment evidence, such as a prior inconsistent statement by the witness or the witness' criminal record, the defendant would not have had a full and fair opportunity to cross-examine the witness, and admission of the prior testimony violates the defendant's right to confront the witness. **Commonwealth v. Bazemore**, 614 A.2d 684, 688 (Pa. 1992). It is the

defendant's burden to show that he was denied vital impeachment evidence at the time of the preliminary hearing. *Leaner*, 202 A.3d at 775.

Here, Benson does not dispute he cross-examined Browning at his preliminary hearing. Further, Benson acknowledges that he did not cross-examine Browning at the pretrial hearing to preserve his own habeas corpus claim so no evidence could be used against him. N.T., 6/30/2022, at 73-74. But regardless of why Benson chose not to cross-examine the witness at that time, there is no question that he had the opportunity to cross-examine her. *See Commonwealth v. Wholaver*, 989 A.2d 883, 904 (Pa. 2010) (noting that where defendant had the opportunity to cross-examine a witness, the right to confrontation has been met). Benson claims, in an entirely conclusory manner, that his opportunity to cross-examine Browning was not "full and fair" because he was not able to attack her credibility; however, Benson does not specify any impeachment evidence he would have used but was unavailable to him at the pertinent times. *See Bazemore*, 614 A.2d at 688; *Lerner*, 202 A.3d at 775. Instead, he makes a bare, unsubstantiated assertion. As Benson had a full and fair opportunity to cross-examine Browning, he is not entitled to relief on this claim.

### 3. Admission of Evidence: Rap Video

In his third claim, Benson contends that the trial court abused its discretion in permitting the Commonwealth to introduce a rap music video featuring Benson as evidence of his character and capacity to commit the

crimes in question. Benson's Brief at 18. Benson argues that the video was irrelevant and prejudicial, as it established he dealt drugs and had bad character. *Id.* at 18-19. According to Benson, rap music lyrics are not necessarily biographical but rather utilize exaggeration and metaphors to inaccurately depict real-life events. *Id.* at 20. Benson claims the video could have confused and mislead the jury. *Id.*

The admission and exclusion of evidence are within the sound discretion of the trial court, and this Court will not disturb this decision absent an abuse of discretion. *Commonwealth v. Brown*, 200 A.3d 986, 990 (Pa. Super. 2018).

"The threshold inquiry with admission of evidence is whether the evidence is relevant." *Commonwealth v. Yale*, 249 A.3d 1001, 1022 (Pa. 2021) (citation omitted). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. "Evidence that is not relevant is not admissible." Pa.R.E. 402.

Although the Commonwealth sought to introduce several separate videos and lyrics of rap music that Benson performed, the trial court did not allow the introduction of any lyrics and only allowed thirty-three seconds of one video that showed gang-related imagery. *See* Opinion and Order, 9/13/2022, at 7-8. The trial court explained its decision as follows:

> [T]he Commonwealth alleges that [the codefendants] are members of the East Main Money Gang a.k.a. "Blam Squad."

> Evidence that Defendant Benson, and the other defendants, are members of the same gang is probative evidence of the existence of a conspiracy and motive. … The gang related images at the beginning of the … video supports the Commonwealth's allegation that Defendant Benson is a member of the East Main Money Gang and makes it more probable that he entered into a conspiracy with other gang members.

*Id.*

Based upon the arguments advanced by Benson, we cannot conclude that trial court abused its discretion. Benson makes no specific argument to support a finding that the video was improperly admitted. Instead, he devotes his argument in support of this claim to the improper admission of rap lyrics, failing to recognize that the trial court did not admit any lyrics. On this basis, Benson has not established that the trial court abused its discretion in admitting the thirty-three second video. *See* Pa.R.A.P. 2119(a); *see also Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009) (stating that "where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

### 4. Criminal Information

In his fourth issue, Benson contends that the trial court erred in allowing trial to proceed on all counts charged in the criminal information. Benson's Brief at 21, 26. Benson argues that the only charges bound for court following the preliminary hearing were the conspiracy charges. *Id.* He claims that the homicide, aggravated assault, kidnapping, and unlawful restraint charges

were never raised at the preliminary hearing and the court erroneously allowed these charges to proceed after the Commonwealth filed an amended information. *Id.* at 21-22. According to Benson, the trial court violated Pa.R.Crim.P. 564, which allows the amendment of an information, so long as it "does not charge an additional or different offense." *Id.* at 24 (quoting Pa.R.Crim.P. 564). Benson asserts that because the amended information significantly added to his charges, no prima facie case for these charges was made, his due process rights were violated, and the trial court should not have allowed the Commonwealth to prosecute the crimes at trial. *Id.* at 25-26.

At the outset, we note that, to the extent Benson now argues that the criminal information should have been dismissed, he has waived this claim based upon his failure to raise it before the trial court. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."). A challenge to a criminal information must be raised in an omnibus pretrial motion. *See* Pa.R.Crim.P. 578, cmt. (stating that a request "to quash or dismiss an information" is one of the "[t]ypes of relief [that is] appropriate for the omnibus pretrial motion"); *Commonwealth v. Martin*, 694 A.2d 343, 344 (Pa. Super. 1997) (stating that "[a] request to quash an information must be made in an omnibus pretrial motion for relief or it is considered waived"). Benson's failure to file an omnibus motion challenging the information prevents this Court from addressing his appellate challenge to the addition of the charges. *See Martin*, 694 A.2d at 344.

Additionally, we observe that Benson misquotes Rule of Criminal Procedure 564 (governing the amendment of a criminal information) in his brief before this Court. In full, the Rule states:

> The court may allow an information to be amended, provided that the information as amended does not charge offenses arising from a different set of events and that the amended charges are not so materially different from the original charge that the defendant would be unfairly prejudiced. Upon amendment, the court may grant such postponement of trial or other relief as is necessary in the interests of justice.

Pa.R.Crim.P. 564.[11]

The additional crimes charged in the criminal information do not arise of a different series of events than the originally charged conspiracy. Further, Benson makes no showing that he was prejudiced or that he required a continuance to prepare his defense that was denied by the trial court.

Nor has Benson shown that his due process rights were violated. An essential element of a criminal defendant's procedural due process rights is a reasonable notice of the charges against him. *Commonwealth v. Baldwin*, 8 A.3d 901, 903 (Pa. Super. 2010). "Due process requires a criminal statute to give fair warning of the conduct prescribed, and the criminal information must provide fair notice of every crime of which a criminal defendant is accused." *Commonwealth v. Widger*, 237 A.3d 1151, 1164 (Pa. Super.

---

[11] Benson quotes a prior version of Rule 564, but the rule was amended in 2016 to the above-quoted language "to more accurately reflect the interpretation of this rule" by our Supreme Court and this Court since the passage of the Rule in 1974. Pa.R.Crim.P. 564, cmt.

2020); *see also Commonwealth v. Sims*, 919 A.2d 931, 939 (Pa. 2007) ("Such notice ensures that, if the Commonwealth prevails at trial, the defendant's conviction is not arbitrary or oppressive.").

The record reflects that the Commonwealth originally charged Benson with two counts each of conspiracy to commit criminal homicide, aggravated assault, kidnapping, and unlawful restraint. Criminal Complaint, 6/11/2021, at 1-3. Each of these charges were held for court following the preliminary hearing on June 9, 2021. On June 28, 2021, the Commonwealth filed a criminal information against Benson which, in addition to the conspiracy charges held over at the preliminary hearing, contained two counts each of criminal homicide, aggravated assault, kidnapping, and unlawful restraint. *See* Information, 6/28/2021, at 1-3 (unnumbered). After the criminal information was filed, Benson filed a motion for habeas corpus, arguing that the Commonwealth failed to make a prima facie case on the conspiracy charges. The trial court held a hearing on the motion and found that "the Commonwealth has made out a prima facie case with respect to the charges filed against Benson." N.T., 6/30/2022, at 171; N.T., 10/17/2022, at 37.

As such, even if not waived, we find no error by the trial court in allowing the charges not raised at the preliminary hearing to go forward to trial. Benson's fourth claim fails.

## 5. <u>Admission of Evidence: Phone Number</u>

In his fifth issue raised on appeal, Benson argues that the trial court abused its discretion in admitting evidence of a phone number that had not been properly authenticated and linked to him. Benson's Brief at 26-28. Benson contends that "the Commonwealth improperly identified cell phone tower pings as being the phone number linked to [Benson]." *Id.* at 28. According to Benson, the Commonwealth did not present any evidence to establish he was in possession of the cell phone at the time of the cell phone tower pings. *Id.* Benson thus claims the Commonwealth failed to authenticate his ownership of the phone. *Id.* According to Benson, the evidence was highly prejudicial because it corroborated Wyrick's testimony that Benson was present and involved in the crimes. *Id.* at 29. Benson seeks a new trial. *Id.*[12]

"[T]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). "Authentication generally entails a relatively low burden of proof[.]" *Commonwealth v. Murray*, 174 A.3d 1147, 1157 (Pa. Super. 2017) (citation

---

[12] Benson properly preserved his claim regarding the authentication of a phone attributed to him before the trial court. *See* N.T., 10/20/2022, at 928-29; *see also* Trial Court Opinion, 8/1/2023, at 32. In his brief, Benson also raises a claim related to the "shared phone." Benson's Brief at 29. The trial court correctly found that Benson waived any claims related to the "shared phone" by failing to object or otherwise raise the argument below. Trial Court Opinion, 8/1/2023, at 32-33; *see* Pa.R.A.P. 302(a). Therefore, we need not address any claims about the "shared phone."

omitted). Circumstantial evidence may be used to authenticate evidence. **Commonwealth v. Orr**, 255 A.3d 589, 595-96 (Pa. Super. 2021).

Regarding the authentication issue for the phone number in the report associated with Benson ending in 9274, FBI Agent John Orlando testified that in preparing the report, he reviewed the Commonwealth's case file, including the cell phone extraction report from Wyrick's phone completed by Special Agent April Campbell. The extraction report contained a list of contacts of names and cell phone numbers, a list of the codefendants' names and nicknames, including Benson's nickname of "Trigg," and cell phone records and certifications. **See** N.T., 10/20/2022, at 925-27, 938; N.T., 10/19/2022, at 589-93 (Commonwealth Exs. at 92-96A — cell phone records and certifications for various numbers); N.T., 10/19/2022, at 635 (Commonwealth Ex. 100 — cell phone extraction report); N.T., 10/19/2022, at 652 (Commonwealth Ex. 101 — pictures, names, and nicknames of the defendants). Special Agent Campbell testified that two phone numbers in Wyrick's phone were associated with "Trigg"—one ending in 9274 and one ending in 9488.[13] N.T, 10/19/2022, at 636. Pennsylvania State Police Trooper Sonny Halterman testified that on May 26, 2017, he conducted a traffic stop involving Benson at which time stated that his phone number was the number ending in 9274. **Id.** at 622. Based upon this evidence, we conclude that the

---

[13] The full phone numbers were included in the records and testimony at trial.

Commonwealth properly authenticated the phone number associated with Benson and this claim merits no relief. **See Orr**, 255 A.3d at 595-96.

Benson's additional arguments related to the cellphone tower pings involving the phone in question are unsupported by the record. Pointedly, Benson's phone was never tracked, obtained, or analyzed in this case. N.T., 10/20/2022, at 997. Benson points to no testimony that his phone was ever linked to a particular cell tower or geographic location. To the contrary, Agent Orlando specifically stated that he analyzed six numbers, including a "shared phone," Callender's phone, the victims' phones, Wyrick's phone, and Bergmann's phone. N.T., 10/20/2022, at 936-37; **see also id.** at 935 (Commonwealth Ex. 102 — FBI Cellular Analysis Report); Trial Court Opinion, 8/1/2023, at 30 (observing that "[t]he FBI report mapped the locations of six cell phones and any incoming or outgoing phone calls and text messages sent or received by those phone numbers," none of which was the cell phone attributed solely to Benson). Therefore, this claim is without merit.

### 6. Admission of Evidence: Drug Dealer

In his sixth claim, Benson contends that the trial court abused its discretion in admitting evidence that he was a drug dealer in the community. Benson's Brief at 29. Benson argues that the prejudicial value of this evidence outweighed the probative value. **Id.** at 29-31. Benson further argues that the evidence was not representative of the community's consensus and

improper on that basis as well. *Id.* at 30. Benson seeks a new trial. *Id.* at 31.

The trial court states that it is unclear from the record whether Benson preserved this claim for appeal. *See* Trial Court Opinion, 8/1/2023, at 24. The trial court highlights that Benson's motion in limine sought to exclude his prior criminal charges and convictions but does not mention evidence that he was a drug dealer in Johnstown. *Id.* Further, the trial court notes that Benson did not join Washington's motion in limine that did raise this issue. *Id.*

Our review of the record comports with that of the trial court. This issue is therefore waived. *See* Pa.R.A.P. 302(a). Regardless of waiver, the issue is also meritless.

"Generally, evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity." *Commonwealth v. Sherwood*, 982 A.2d 483, 497 (Pa. 2009) (citing Pa.R.E. 404(b)(1)). "However, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident." *Sherwood*, 982 A.2d at 497 (citing Pa.R.E. 404(b)(2)). "In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact." *Sherwood*, 982 A.2d at 497.

Applying this precedent, the trial court did not abuse its discretion in admitting this evidence at trial. Benson's drug related activity was relevant and probative of his motive and intent to kidnap, assault, and ultimately murder the victims. **See Commonwealth v. Ganjeh**, 300 A.3d 1082, 1091 (Pa. Super. 2023) (stating that "[t]he challenged evidence shows the chain or sequence of events which formed the history of the case, is part of the natural development of the case, and demonstrates [a]ppellant's malice and ill-will toward the victim"). Therefore, Benson is not entitled to relief.

### 7. Admission of Evidence: Reighard's Recorded Statement

In his seventh claim, Benson contends that the trial court erred in failing to allow him to introduce a recording of Reighard being questioned by the police. Benson's Brief at 31-32, 34. Benson notes that Reighard was unavailable to testify because he is dead, and the recording was admissible under the hearsay exception—statement against interest. **Id.** at 32-33. Benson argues that the recording implicates Reighard in the murders, as it contains information that would not have been known by anyone who was not involved in the murders. **Id.** at 32, 34. Benson asserts that the refusal to admit this evidence "eliminated a line of defense that Reighard and [Bergmann] were in fact the individuals who committed this crime." **Id.** at 34; **see also id.** (noting "Reighard and Bergmann knew the victims were in possession of large amounts of drugs and both Reighard and Bergmann were

drug users[, which] provided motive and opportunity for them to have committed the crimes").

Hearsay is a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). Hearsay is inadmissible "except as provided by [the Rules of Evidence], by other rules prescribed by the Pennsylvania Supreme Court, or by statute." Pa.R.E. 802; *see also Commonwealth v. Rivera*, 238 A.3d 482, 492 (Pa. Super. 2020) ("Hearsay generally is inadmissible unless it falls within one of the exceptions to the hearsay rule delineated in the Pennsylvania Rules of Evidence.").

A statement may be admitted under the hearsay exception as a statement against interest if the declarant is unavailable as a witness and

> (A)  a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and
>
> (B)  [the statement] is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Pa.R.E. 804(b)(3).

Initially, we observe that Benson does not provide any indication as to the statements by Reighard that he sought to introduce at trial or provide any

precedent that supports a finding of its admissibility. Instead, he makes bald statements about Reighard's statement to the police and contends that was admissible under Rule 804(b)(3). "Mere issue spotting without analysis or legal citation to support an assertion precludes our appellate review of a matter." ***Commonwealth v. Martz***, 232 A.3d 801, 811 (Pa. Super. 2020) (citation and brackets omitted). Therefore, this claim is waived.

Nonetheless, the trial court states that Benson sought to introduce Reighard's statements to the police that he saw the victims at Kralik's home, and they were ultimately killed in Kralik's home. ***See*** Trial Court Opinion, 8/1/2023, at 26-27 (citing N.T., 10/20/2022, at 1043-46). The trial court rejected Benson's claim:

> Here, Reighard's statements only demonstrated that he had some alleged knowledge of the murders. None of Reighard's statements, however, rose to the level of tending to subject him to criminal liability. … In other words, having some knowledge of certain details of a crime does not per se subject someone to criminal liability.[fn]
>
> > [fn] We note that Reighard's statements were inconsistent with the testimony of the Commonwealth's witnesses including, Kralik, Bergmann, Browning, Wyrick, and the forensic evidence.

Trial Court Opinion, 8/1/2023, at 18 (footnote in original); ***see also*** N.T., 10/20/2022, at 1045-46 (trial court's denying admission of Reighard's statement at trial because "simply making statements, … things he may have knowledge of, I didn't hear any of those that would be statements against interest").

We find no abuse of discretion in the trial court's ruling. Reighard's statement contradicted the evidence of record and did nothing to expose him to criminal liability. *See* Pa.R.E. 804(b)(3)(B); *cf. Commonwealth v. Statum*, 769 A.2d 476, 480 (Pa. Super. 2001) (noting that an unavailable witness' statement was admissible under the statement against interest hearsay exception because the witness admitted to the crime for which the defendant had been charged). Therefore, the trial court properly denied admission of the evidence.

## 8. Sufficiency of the Evidence

In his final claim, Benson contends that the evidence was insufficient to support his first-degree murder convictions. Benson's Brief at 34-35. Benson argues that he did commit the murders, stating, "at best the record supports a conviction of conspiracy or attempted murder, [as] the record evidence in fact demonstrates that [Washington] committed the killings and that [Benson] was simply part of a conspiracy." *Id.* at 37.

Benson once again fails entirely to support his claim with citations to the record or pertinent authority other than boilerplate law, or any discussion thereof. *See Johnson*, 985 A.2d at 924. His claim is also without merit.

Our standard of review of sufficiency claims is as follows:

Because a determination of evidentiary sufficiency presents a question of law, our standard of review is de novo and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient

to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the [factfinder] to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the [factfinder].

*Commonwealth v. Rosario*, 307 A.3d 759, 764–65 (Pa. Super. 2023)

(citation omitted).

To convict a defendant of first-degree murder, the jury must find that (1) a human being was unlawfully killed; (2) the defendant is responsible for the killing; and (3) the defendant acted with a specific intent to kill. Specific intent to kill can be established through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body. Further, to prove conspiracy, the trier of fact must find that: (1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime. Finally, each member of a conspiracy to commit homicide can be convicted of first-degree murder regardless of who inflicted the fatal wound.

*Commonwealth v. Montalvo*, 956 A.2d 926, 932 (Pa. 2008) (citations, ellipses, and quotation marks omitted).

Here, the credible evidence established that Benson, Washington, and Wyrick were part of a gang from Ohio. N.T., 10/19/2022, at 648-50; N.T., 10/18/2022, at 255. After learning their drugs, money, and firearm were stolen, the three sought to find the culprit and actively searched for the victims. N.T., 10/19/2022, at 672-77, 680-83, 690-92. After Washington

and Wyrick brought the victims to stash house, Benson arrived on the scene and asked the victims the location of the drugs, money, and firearm. *Id.* at 692. Upon finding some of the drugs and money in Staniszewski's truck, Benson stated "I'm goin' to kill these mother-fuckers." N.T., 10/19/2022, at 697. Thereafter, Benson and Washington took the victims into the woods and as Smith attempted to escape the scene, Benson shot him in the back. *Id.* at 701. Benson's gun then jammed, and Washington left the scene to retrieve a new gun while Wyrick and Benson waited with the victims. *Id.* at 703-04. Washington returned to the scene with a gun and shot both victims twice in the head. *Id.* at 704-05. Washington, Benson, and Wyrick fled the scene, abandoned Staniszewski's truck in another location after wiping it down, and discarded their clothes and firearms. *Id.* at 706-08.

The evidence, viewed in a light most favorable to the Commonwealth, established that Washington, Benson, and Wyrick conspired in finding the victims, taking them to an isolated spot in the woods, killing them, and disposing of the evidence. *See* Benson's Brief at 37 (conceding that the evidence supported a finding that he was part of the conspiracy). Therefore, despite the fact Washington inflicted the fatal wounds on the victims, Benson was guilty of first-degree murder for his role in the conspiracy to kill the victims. *See Montalvo*, 956 A.2d at 932.

Judgment of sentence affirmed.

- 34 -

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

5/9/2024